## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF NEW JERSEY
### (Newark Division)

| | |
|---|---|
| **REV. KEVIN ROBINSON** and )<br><br>**RABBI YISRAEL A. KNOPFLER,** )<br><br>        Plaintiffs, )<br>    v. )<br><br>**PHILIP D. MURPHY,** Governor of the )<br>State of New Jersey, in his )<br>official capacity, and )<br><br>**COLONEL PATRICK J. CALLAHAN**, )<br>Superintendent of State Police and State )<br>Director of Emergency Management, )<br>in his official capacities, )<br><br>       Defendants. ) | **Case No.  2:20-CV-5420-CCC-ESK** |

## FIRST AMENDED COMPLAINT
## FOR CIVIL RIGHTS VIOLATIONS, INJUNCTIVE RELIEF
## AND A DECLARATORY JUDGMENT

Plaintiffs, by and through their counsel, complain as follows:

### INTRODUCTION

1.     This civil rights action was originally brought as a challenge solely to Executive Order 107 (2020), effective March 21, 2020 ("Order 107"), issued by defendant Governor Phil Murphy as a response to the COVID-19 epidemic pursuant to his purported "emergency powers" under the New Jersey Civil Defense and Disaster Control Act ("DCA").

2.     Order 107 (a) orders the entire population of New Jersey to stay home, allowing excursions only for the nine reasons Defendant deems permissible; (b) orders the closure of all "brick-and-mortar premises of non-essential retail businesses" and (c) declares that all

"Gatherings of individuals…", including religious gatherings, "are cancelled, unless otherwise authorized by any part of this order."  Order 107, ¶¶ 5 and 6.

3.       This Amended Complaint, by a Catholic priest, now joined by an Orthodox Rabbi, expands the original challenge to Defendant's plainly unconstitutional regime to include an administrative order, AO 2020-4, issued by the Superintendent of the New Jersey State Police in his capacity as State Director of Emergency Management on the same date as Order 107.

4.       Defendants' position is that AO 2020-4 broadly permits "gatherings of individuals" so long as they are ten or less in number.  But that is not the case.

5.       AO 2020-4 merely advises law enforcement officials, not the general public, as follows: "Pursuant to paragraph 5 of Executive Order No. 107 (2020), it is hereby clarified that gatherings of 10 persons or fewer are *presumed* to be in compliance with the terms and intentions of the Executive Order, *unless* clear evidence exists to the contrary." (emphasis added)

6.       AO 2020-4 is on its face an unconstitutionally vague standard for law enforcement that fails to give adequate notice to the public, or even definite guidance to law enforcement, of which "gatherings" of ten-or-less violate the "presumption" of lawfulness because of "clear evidence… to the contrary."

7.       As pleaded below, AO 2020-4 is at variance with the defendant Murphy's repeated advice to the public that *all* gatherings of any size are prohibited, including religious services of any kind, and that all "gatherings of people" may be reported to him, via a government-maintained informant website, as violations of Order 107.

8.       Now that this action has been commenced, however, defendant Murphy advises through council that he will "correct" his prior advice to the public, although it is not clear whether there will be a further executive order embodying AO 2020-4's impermissibly vague

"presumption" of a lawful gathering of ten or less "unless" a law enforcement officer, in his unfettered discretion, believes that "clear evidence exists to the contrary."

9.      Order 107, even as purportedly modified by AO 2020-4, is not a neutral and generally applicable restriction of constitutional rights on the grounds of a public health emergency but rather a self-defeating hodgepodge of prohibitions and exceptions for regulating normal social, political, religious and economic activity, the likes of which has never been seen in the history of this State. Therefore, it cannot withstand the required strict scrutiny and narrow tailoring of its scheme for selective suspension of the First and Fourteenth Amendments.

10.     Plaintiffs now seek declaratory and injunctive relief against Order 107 and AO-2020-4, which, both individually and taken together, both facially and as applied to them, violate the First and Fourteenth Amendments to the United States Constitution.

## PARTIES

11.     Plaintiff Father Kevin Robinson is a Catholic priest, ordained in 1991, who engages in priestly ministry in a church located in this District.

12.     Rabbi Yisrael A. Knopfler, ordained 20 years ago in Israel, is a rabbi of the Orthodox Jewish tradition who presides over a synagogue and congregation located in this District. He is a resident of the State of New Jersey.

13.     Defendant Philip D. Murphy is Governor of the State of New Jersey and is sued in his official capacity. At all times pertinent to this action Murphy and his subordinates have acted under color of State law.

14.     Defendant Colonel Patrick J. Callahan is Superintendent of State Police and StateDirector of Emergency Management.   As such, Callahan is the final decision-maker

respecting AO 2020-4, and is sued in his official capacity. At all times pertinent to this action, Callahan and his subordinates have acted under color of State law.

## JURISDICTION AND VENUE

15.     This action raises federal questions under the First and Fourteenth Amendments of the United States Constitution and under federal law, 28 U.S.C. §§ 2201 and 2202 (Declaratory Judgments), as well as 42 U.S.C. §§ 1983, 1988, and 1920.

16.     This Court has jurisdiction over these federal claims under 28 U.S.C. §§ 1331 and 1343.

17.     This Court has authority to grant the requested injunctive relief under 28 U.S.C. § 1343(3), the requested declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and plaintiffs' prayer for costs, including reasonable attorneys' fees, under 42 U.S.C. § 1988 and 28 U.S.C. § 1920.

18.     Venue is proper in the District of New Jersey pursuant to 28 U.S.C. § 1391, as a substantial part of the events giving rise to the claims herein arose in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

19.     This First Amended Complaint hereby incorporates by reference the Supplemental Declaration of plaintiff Robinson, Exhibit A hereto, and the Declaration of plaintiff Knopfler, Exhibit B hereto, as verification of the facts pertaining to their religious beliefs, practices and experiences with Order 107 and AO 202-4.

### Plaintiff Robinson's Religious Beliefs and Practices

20.     Plaintiff Rev. Kevin Robinson is a duly ordained Catholic priest, ordained in 1991, who offers Mass and provides the other Sacraments of the Catholic Church to his congregation at Saint Anthony of Padua Church in North Caldwell, NJ.

21.     The Holy Sacrifice of the Mass is the very heart of Catholic worship without which the Catholic faith would not exist.

22.     Plaintiff Robinson offers two Masses on Sundays: a Low Mass, in which he is assisted by two altar servers, and a High Mass which involves five altar servers.

23.     The congregation at each Mass is approximately fifty people in addition to the priest and the altar servers.

24.     It is a Catholic teaching that one cannot receive Sacraments without being physically present for their administration. Sacraments cannot operate by video link.

25.     Forbidding Catholics to be physically present for worship in their church is a serious deprivation of their exercise of the Catholic religion and a grave interference in plaintiff's religious ministry and priestly mission to his flock.

<u>**Rabbi Knopfler's Religious
Beliefs and Practices**</u>

26.     Plaintiff Knopfler is a rabbi of the Orthodox Jewish tradition. Ordained over 20 years ago in Israel, he presides over a synagogue located in Lakewood, NJ, Congregation *Premishlan*.

27.     Plaintiff's Knopfler's congregation numbers 45-50 practitioners of Orthodox Judaism.

28.     Plaintiff Knopfler also presides over the rabbinical court *Beis Din Tzedek* of Lakewood, which has eleven members.

29.     Plaintiff Knopfler's synagogue accommodates 30 people at a time, to which he ministers by holding two Davening services each Saturday, starting 35 minutes before sunrise and then at 9:30 a.m.

30.     In addition, each day the synagogue hosts prayers during morning services, usually around 8:30, a noon service, and a night service around 11 p.m.

31.     The full panoply of synagogue prayers required by plaintiff Knopfler's religion must have a minimum quorum of ten, and several of the congregants, a few times a week, must gather closely around the Torah for a reading from the Torah.

32.     Members of the congregation also gather in plaintiff Knopfler's synagogue to pray and study the Torah and the Talmud together, especially young men.

33.     These religious activities require physical presence in the synagogue and cannot be conducted by video.

### Public Notification of Order 107
### Banning "Gatherings of Individuals"

34.     On March 21, 2020, Defendant issued Order 107 for the stated purpose of "reducing the rate of community spread of COVID-19." (Order 107 at 1)[1]/

35.     Order 107 invokes Defendant's "emergency powers," citing the New Jersey Civilian Defense and Disaster Control Act (DCA) to justify its provisions. (Order 107 at 4)

36.     Order 107 supersedes the "operative provisions" of prior Executive Order 104[2]/ (2020) ("Order 104"), issued March 16, 2020, but retains its "factual findings." (Order 107, ¶ 1).

37.     Order 104 permitted "gatherings of persons in the State of New Jersey" under the following terms:

> All gatherings of persons in the State of New Jersey shall be limited to 50 persons or fewer, excluding normal operations at airports, bus and train stations, medical facilities, office environments, factories, assemblages for the purpose of industrial or manufacturing work, construction sites, mass transit, or the purchase of groceries or consumer goods.

---

[1]/*See*, https://nj.gov/infobank/eo/056murphy/pdf/EO-107.pdf
[2]/*See*, https://nj.gov/infobank/eo/056murphy/pdf/EO-104.pdf

38.     Order 107 eliminates the allowance of gatherings of "50 persons or fewer," and declares that "All New Jersey residents shall remain home or at their place of residence" with the following nine exceptions (in pertinent part):

1.  obtaining goods or services from essential retail businesses…;
2.  obtaining takeout food or beverages…;
3.  seeking medical attention, essential social services, or assistance from law enforcement or emergency services;
4.  visiting family or other individuals with whom the resident has a close personal relationship…;
5.  reporting to, or performing, their job;
6.  walking, running, operating a wheelchair, or engaging in outdoor activities with immediate family members, caretakers, household members, or romantic partners while following best social distancing practices with other individuals, including staying six feet apart;
7.  leaving the home for an educational, religious, or political reason;
8.  leaving because of a reasonable fear for his or her health or safety; or
9.  leaving at the direction of law enforcement or other government agency.

Order 107 at ¶ 2.

39.     Order 107 provides that "Gatherings of individuals, such as parties, celebrations, or other social events, are cancelled, unless otherwise authorized by any part of this Order." (Order 107, ¶ 5)

40.     The term "gatherings of individuals" is not defined.

41.     On its face, Order 107 appears to prohibit all "gatherings of individuals," including religious gatherings, anywhere in the State of New Jersey, whether they take place in a church, chapel, or synagogue, indoors or outdoors.

42.     Order 107 provides that violators of the Order, and those who aid or abet them, are subject to arrest and criminal prosecution for "disorderly conduct" under N.J.S.A. App. A: 9-49 and 50, the criminal penalty provisions of the DCA.

## Order 107's Unconstitutional Double Standard
## on "Gatherings" and "Social Distancing"

43.     While forbidding all undefined "gatherings of individuals," Order 107 permits large gatherings of people to patronize or work in what Defendant deems "essential retail businesses," defined as follows:

a.  Grocery stores, farmer's markets and farms that sell directly to customers, and other food stores, including retailers that offer a varied assortment of foods comparable to what exists at a grocery store;

b.  Pharmacies and alternative treatment centers that dispense medicinal marijuana;

c.  Medical supply stores;

d.  Retail functions of gas stations;

e.  Convenience stores;

f.  Ancillary stores within healthcare facilities;

g.  Hardware and home improvement stores;

h.  Retail functions of banks and other financial institutions;

i.  Retail functions of laundromats and dry-cleaning services;

j.  Stores that principally sell supplies for children under five years old;

k.  Pet stores;

l.  Liquor stores;

m.  Car dealerships, but only to provide auto maintenance and repair services, and auto mechanics;

n.  Retail functions of printing and office supply shops; and

o.  Retail functions of mail and delivery stores.

*See*, Order 107, ¶ 6.

44.     Order 107 imposes *no size limitation on gatherings related to "essential retail businesses,"* save that imposed by later Executive Order 122 ("Order 122"): a limitation to 50 percent of the building's capacity at any one time and special hours for high-risk individuals, but only "wherever possible." (Order 122, ¶ 1 a-b).

45.     Order 122 further provides a "social distancing" protocol for "essential retail businesses" of masks and gloves for employees, masks *but not gloves* for customers, sanitizing common surfaces, and six feet of separation (where physical barriers are not "feasible") except "at the moment of payment and/or exchange of goods."  (Order 122, ¶¶ 1 b-k)

46.     Thus Orders 107 and 122 combined allow for thousands if not millions of direct physical contacts each day between large numbers of people in retail settings, with customers touching innumerable common surfaces without gloves, including products on shelves, touch pads, keypads, styluses for use on touch screens, as well as currency and coins.

47.     Order 107 orders the immediate closure of all "*non-essential retail businesses*," but says nothing about *non-retail* businesses, including professional services; thus leaving all *non-retail* businesses free to operate *without* mass gathering restrictions but only sanitization requirements imposed on building owners. Order 107, ¶¶ 6 and 10; Order 122 at 2.

48.     Order 107 imposes no size limitations on overall *workforce* size in either "*essential* retail" businesses or even the permitted *non-retail* businesses. The Order provides only that the favored businesses "must accommodate their workforce, *wherever practicable*, for telework or work-from-home arrangements" in the judgment of business owners. (Order 107, ¶¶ 10-11) (emphasis added)

49.     As to workforce size, Order 107 merely prescribes for both "*essential*" retail businesses and *non-retail* businesses "*best efforts* to reduce staff on site to the minimal number

necessary to insure that essential operations can continue," providing purely advisory examples of employees who, in defendant Murphy's judgment, "need to be physically present at their work site in order to perform their duties…" (Order 107, ¶11)(emphasis added); *see* Order 122 (referencing Order 107's precatory requirement of "best efforts to reduce staff on site…").

50.     Order 107 exempts the media from any staffing or mass gathering restrictions whatsoever: "Nothing in this Order shall be construed to limit, prohibit, or restrict *in any way* the operations of newspapers, television, radio, and other media services." (Order 107, ¶ 19)(emphasis added)

51.     Order 107 fails to mention, and thus leaves untouched, Order 104's allowance of unlimited gatherings in "airports, bus and train stations" while Order 122 provides only for various sanitization procedures for "high-touch areas" in those places. Order 122, ¶ 5.

52.     Thus Order 107 allows for thousands if not millions of interpersonal contacts in transportation hubs as well as contact with such things as seating, kiosks doorknobs, handrails, restrooms and so forth.

53.     Order 107 recites no medical or epidemiological evidence that would support the claim that the risk of viral transmission from the forbidden "gatherings of individuals" or "non-essential retail businesses" is any greater than it is with the permitted "essential retail businesses," non-retail businesses, airports, bus and train stations.

54.     In forbidding undefined "gatherings of individuals" while allowing large numbers of people to access the premises of the permitted businesses and transportation hubs, Order 107 on its face categorizes all First Amendment-protected social, political and religious gatherings as "non-essential," while favoring certain business activities as either "essential" or generally allowable (non-retail businesses including law firms, accounting firms, banks, etc.).

55.     Order 107 thus denies persons who are together for a religious purpose the same freedom of movement and assembly as persons who are together for business purposes.

56.     Order 107's distinctions between permitted "*essential retail*" and *non-retail* business gatherings, versus the forbidden "*non-essential*" retail, social, political and religious gatherings, constitutes a hodgepodge of arbitrary categories that has no rational relationship to the stated goal of avoiding mass gatherings or maintaining "social distancing," which is not shown by Order 107 to be any more difficult in the forbidden categories than it is in the permitted ones.

57.     On the contrary, "social distancing" is clearly easier to maintain in discrete religious gatherings held only at certain times in churches and synagogues than it is amidst the vast and constant 24/7 hubbub of retail sales and office environments involving potentially millions of people in the State of New Jersey.

58.     In sum as a measure purporting to be rationally related to the goal of limiting the spread of COVID-19, Order 107 and 122, taken together, provide no objective medical criteria or coherent rationale for discriminating between gatherings related to essential retail businesses (permitted), non-essential retail businesses (forbidden), non-retail businesses (permitted), and social, political, and religious gatherings (all forbidden). Order 107's scheme makes no sense and is in many respects at war with its own stated purposes.

### Defendant's Explanation of His Ban on "Gatherings" as Published on His Official Website

59.     According to defendant Murphy's official FAQ page, which provides information to the general public on the Governor's official interpretation of Order 107, the "gatherings of individuals" forbidden by Defendant, in any number, include religious services:

**Are churches and other houses of worship still offering services?**:

Executive Order No. 107… *prohibits all gatherings* of individuals, such as parties, celebrations, or other social events, unless otherwise authorized by the Order. Residents should consult with their local houses of worship *to see what alternatives are being offered in place of in-person services.* (emphasis added)[3]/

*See*, Exhibit C to this Complaint.

60.     This information for the general public was published on March 23, 2020 and remains the same as of May 3, 2020.

61.     The same official FAQ page states that funerals and other memorial services are also totally prohibited according to the same official interpretation:

**Are funerals and other memorial services allowed to be held right now?**

Funerals and other memorial services that involve in-person gatherings may not take place at this time.

In an effort to strengthen the existing social distancing measures in place, the Governor has issued Executive Order No. 107 which prohibits all gatherings of individuals, such as parties, celebrations, or other social events, unless otherwise authorized by the Order.[4]/

*See* Exhibit D to this Complaint.

62.     This information for the general public was likewise published on March 23, 2020 and remains the same as of May 3, 2020.

63.     On April 11, 2020, defendant Murphy caused to be published on the official New Jersey website a FAQ item as follows:

**How can I report a violation of an Executive Order?**

---

[3]/*See*,https://covid19.nj.gov/faqs/nj-information/general-public/are-churches-and-other-houses-of-worship-still -offering-services

[4]/*See*,https://covid19.nj.gov/faqs/nj-information/general-public/are-funerals-and-other-memorial-services-allowed-to-be-held-right-now

You can report a possible violation of any Executive Order using this online form: https://covid19.nj.gov/violation.

Some examples of Executive Order violations include:
- A non-essential business that is operating
- A non-essential construction project
- A business that is not practicing social distancing requirements
- A business that is not allowing remote work of non-essential employees
- *A prohibited gathering of people* [emphasis added]

**Compliance with Executive Orders is not voluntary.**  [emphasis in original][5]/

*See* Exhibit E to this Complaint.

64.    The official reply to this FAQ links to a web page for reporting alleged violations of Order 107.  One of the radio buttons for informing on one's neighbor is labelled: "A gathering of people" without further explanation.[6]/ *See*, Exhibit F to this Complaint.

<u>**The Impact of Order 107's Ban on "Gatherings"**</u>
<u>**on Plaintiff Robinson's Exercise of Religion**</u> [7]/

65.    Following the promulgation of Order 107 and its ban on "gatherings of individuals," all Catholic churches in New Jersey were shuttered and Masses and other gatherings therein ceased.

66.    On March 20, 2020, the day before Order 107 went into effect, a local police officer arrived at plaintiff Robinson's church and demanded that the Mass that was about to begin be cancelled and that the congregation disperse, even though Order 107 was not effective until the following day.

---

[5]/ *See*, https://covid19.nj.gov/faqs/nj-information/general-public/how-can-i-report-a-violation-of-an-executive-order.

[6]/ *See* https://covid19.nj.gov/forms/violation

[7]/ Cf. Exhibit A, Robinson Supp. Dec., for verification of the facts in this section of the Amended Complaint.

67.     The officer was verbally aggressive, repeatedly stating that the Mass could not proceed because of the Governor's order, thus making it clear that plaintiff Robinson was subject to arrest while the members of his congregation were cowering in the basement in fear.

68.     Only when the officer was informed by the local Police Chief via cell phone that Order 107 was not effective until the following day was his implicit threat of arrest withdrawn.

69.     On Thursday, March 26, however, plaintiff Robinson was advised by the same Police Chief via text message that charges would be laid if Order 107 were violated.

70.     Plaintiff Robinson has since refrained from offering Mass for the faithful in his Church or anywhere else in the State of New Jersey.

### The Impact of Order 107's Ban on "Gatherings" on Plaintiff Knopfler's Exercise of Religion [8]/

71.     Defendant Murphy's Executive Order 107 has drastically interfered in the practice of plaintiff Knopfler's Orthodox Jewish religion in the following ways.

72.     On or about March 22, in fear of police action because of Order 107's ban on "gatherings of individuals," plaintiff Knopfler began holding his synagogue's morning prayer services in the backyard of the synagogue so that congregants could disperse if the police were called.

73.     Members of plaintiff Knopfler's congregation stopped attending services in fear of legal consequences from the Governor's order because it bans "all gatherings of individuals," as plaintiff Knopfler confirmed by consulting the aforesaid FAQs on the Governor's website, which stated clearly there must no religious gatherings for worship, funerals, weddings or the like.

---

[8]/ Cf. Exhibit B, Knopfler Dec,. for verification of the facts in this section of the Amended Complaint.

74.    On or about April 3, as the congregants were walking (it being the Sabbath) from different directions to the synagogue, two police cars parked directly outside the synagogue.

75.    The police cars had their overhead red and blue lights on to intimidate plaintiff Knopfler and his congregants and to make it appear to the neighbors that a police intervention was about to occur. The police were clearly surveilling the congregation to look for violations of Order 107.

76.    To avoid a confrontation with the police, plaintiff Knopfler and his congregation avoided having the prayer service in the backyard, escaped through the back gate, and had the prayer service elsewhere.

77.    Because of this police interference, plaintiff Knopfler changed the times of the Saturday morning prayer service, the main prayer service of the week, and the afternoon services as well, as it appeared that the police had learned the regular times of those services from their surveillance.

78.    On or about April 13, plaintiff Knopfler and his congregation were holding morning services in the backyard around 9:30 a.m.  Approximately 20 congregants were present, and the distance between each was about ten feet.

79.    During the service, as required by the Jewish religion, four of the congregants gathered around the Torah to read from it.

80.    Suddenly, two police officers arrived and the congregants began running in all directions. The two officers entered the backyard and walked around while talking on their radios.

81.    Plaintiff Knopfler demanded that the police officers leave the property because they were trespassing, and one replied: "Well, this is an illegal gathering."

82.     The same officer barked at the remaining congregants that they should not move because he was coming back with tickets.

83.     The officers then retreated to the street and were observed attempting to count how many people had remained from the congregation.

84.     The remaining congregants, nine in number, went into a back room of the synagogue in fear of being arrested. They taped garbage bags on the windows and locked the door.

85.     Plaintiff Knopfler and the remnants of his congregation finished reading from the Torah and finished the required prayers, while the young children were sent into the main sanctuary to peek out from the now blacked out windows to let plaintiff Knopfler and his congregation know when the police had left.

86.     A third police officer, apparently a supervisor, arrived and knocked on plaintiff Knopfler's front door, opened the door, and stuck her head inside the house, terrifying plaintiff's 12-year-old daughter.

87.      After the three officers finally left, the remaining congregants also left, checking their windshields for tickets.

88.     A 45-year old-congregant, who had been hiding in the boiler room, emerged from his hiding place quivering and quaking.

89.     Plaintiff Knopfler and his congregation live in fear of another police intervention. Members of the congregation are constantly looking toward the street for police cars, and some hide inside the synagogue and come into the yard only for the most important parts of the services.

90.     Plaintiff Knopfler and his congregation continue to hold the prayer services in the backyard in order to be able to escape the police if and when there is another police disruption of their "illegal gathering."

91.     Because of Order 107, plaintiff Knopfler has also suspended gatherings of the *Beis Din Tzedek* of Lakewood rabbinical court, whose gatherings have sometimes included up to twenty people, including the parties, the secular and rabbinical lawyers, and a three-judge panel of the eleven-member court.

92.     Police in the Township of Lakewood, citing Order 107, broke up a prominent rabbi's funeral on April 2 and issued numerous summonses, as widely reported in the press.

93.     Furthermore, the Lakewood Police have broken up more than a dozen forbidden "gatherings" in Lakewood, some religious and some non-religious, as has also been widely reported in the press, including a Jewish wedding.[9]/

94.     Plaintiff Knopfler heard rumors that gatherings of ten-or-less are lawful under Order 107, but he and his congregation cannot follow the norms of their religion under a regime in which, pursuant to AO 2020-4, only ten people can gather for worship and a police officer subjectively determines whether the gatherings in his synagogue are illegal because of "clear evidence… to the contrary."

## Plaintiff Robinson's Request for Confirmation of the Extent of Order 107's Ban on "Gatherings"

95.     On April 23, 2020, counsel for plaintiff Robinson sent the Governor, the Attorney General of New Jersey and the Acting Chief Counsel to the Governor a demand letter on behalf

---

[9]/    *See*,   http://tomsriver.shorebeat.com/2020/04/police-break-up-four-gatherings-in-lakewood-including-an-open-school-and-backyard-wedding/

of plaintiff in which he made the following inquiries, "Given what appears to be the official interpretation of Order 107...":

1. Is Father Robinson required by Order 107 to close the church premises at 103 Gould Avenue, North Caldwell, NJ?

2. Are Father Robinson and the members of his congregation forbidden to gather, in any number, for Mass or other public functions not only at said church premises but anywhere else in the State of New Jersey?

3. Are Father Robinson and those who might assist him subject to arrest and/or criminal prosecution if they gather for Mass or other public functions, in any number, at said church or elsewhere in the State of New Jersey?

*See* Exhibit G to this Complaint.

96.     The demand letter requested a satisfactory response to these queries within five (5) days, failing which plaintiff Robinson "will pursue legal remedies, including those available under 42 U.S.C. § 1983." No reply was received and this action was commenced on April 30, 2020.

## Defendant Callahan's Ambiguous "Clarification" Respecting the Size of "Gatherings"

97.     The day after this action was commenced, however, counsel for the Governor took the position that an administrative order, AO 2020-4, issued March 21, 2020 by defendant Callahan, provides that "gatherings of individuals" consisting of ten or fewer persons are allowed. *See* Exhibit H to this Complaint.

98.     However, AO 2020-4 does *not* provide blanket permission for gatherings of ten or fewer people, but rather ambiguously states as follows:

1. Pursuant to paragraph 5 of Executive Order No. 107 (2020), it is hereby clarified that gatherings of 10 persons or fewer are *presumed* to be in compliance with the terms and intentions of the Executive Order, *unless* clear evidence exists to the contrary. [emphasis added]

99.     The term "clear evidence to the contrary" is not defined.

18

100.     AO 2020-4 is not a permission promulgated to the general public by the Governor, but merely *a law enforcement advisory* issued from the Police Office of Emergency Management by the Superintendent of State Police, defendant Callahan, acting also in his capacity as State Director of Emergency Management.

101.     AO 2020-4 is framed as advice to law enforcement officers that they are merely to "presume" that gatherings of ten or fewer people are in compliance with "the terms and intentions of the Executive Order" *unless* they determine *in their unfettered discretion* that "clear evidence exists to the contrary"—with no definition whatever of the evidence in question.

102.     Only as to *non-business gatherings, including religious ones*, does Order 107, combined with AO 2020-04, subject people gathered together to a merely "presumptively" lawful ten-person limit that can be deemed unlawful whenever a law enforcement official subjectively decides otherwise.

### The Promised "Corrections" of the Governor's Advice on "Gatherings"

103.     Counsel for defendant advises that the above-noted answers to FAQs regarding the meaning of Order 107, provided to the general public, are to be "corrected" by defendant Murphy—more than a month after they were issued.

104.     There is no indication yet that there will also be a correction of the aforesaid Governor's web page and form by which members of the general public can report alleged violations of Order 107 by their fellow citizens based on "a gathering of people."

105.     There is no indication yet that defendant Murphy will definitively confirm to the public via a further Executive Order that his prior published advice on "gatherings of individuals" of any size was wrong and is rescinded, and that social, political or religious

gatherings of ten persons or less are all permitted without rebuttable presumptions or conditions not imposed on the business gatherings defendant Murphy has favored under Order 107.

### The Impact of AO 2020-4 on
### Plaintiff Robinson's Exercise of Religion [10]/

106.    AO 2020-4's vague and ambiguous "presumed" allowance of gatherings of ten or fewer people "unless clear evidence exists to the contrary" burdens plaintiff's exercise of religion by interfering with the normal requirements of Mass for the faithful.

107.    AO 2020-04, and thus Order 107 itself, permits no more than 7 people at a time at a Low Mass with two altar servers or 4 people at a time for a High Mass with five altar servers, a number of congregants which, as pleaded above, would be completely insufficient to address the needs of plaintiff Robinson's congregation of approximately 50 people at each Mass on Sunday or approximately 100 persons overall.

108.    To comply with the ten-or-fewer dictate without compromising his religion, plaintiff Robinson would have to offer an impossible 14 Low Masses or an even more impossible 25 High Masses on a Sunday

109.    Moreover, the servers at each Mass, who assist the priest throughout, must often be closer to him and to each other than the "social distancing" minimum of six feet provided in Order 107, ¶ 3, as must communicants when receiving Holy Communion, but no closer than people frequently are in the retail or office environments.

110.    Consequently, in the unfettered discretion of a law enforcement officer, the offering of Mass by plaintiff, even under such oppressively limiting conditions, could constitute "clear evidence" that the merely presumptive permission for "gatherings of 10 persons or fewer"

---

[10]/ Cf. Exhibit A, Robinson Supp. Dec., for verification of the facts in this section of the Amended Complaint.

is unlawful, with the result that plaintiff could face criminal prosecution, arrest or other police interference with his religious practice.

111.    Accordingly, plaintiff continues to comply with Order 107 by not offering Mass for the faithful or presiding over any other religious gathering anywhere in New Jersey.

<u>**The Impact of AO 2020-4 on**</u>
<u>**Plaintiff Knopfler's Exercise of Religion**</u> [11]/

112.    AO 2020-4's vague and ambiguous "presumed" allowance of gatherings of ten or fewer people "unless clear evidence exists to the contrary" burdens plaintiff Knopfler's exercise of religion by limiting his congregation to ten persons, when his congregation for each service is greater than ten and other religious gatherings larger than ten, including weddings and Bar Mitzvahs, would be prohibited.

113.    Given the supposed limitation of religious gatherings to ten or fewer people, the required quorum of ten men for all religious services would mean excluding the mother, sisters and other family members at a Bar Mitzvah and even the wife at a wedding in the synagogue, as well as any relatives and friends who would wish to be present.

114.    A limitation of ten people or less substantially burdens the exercise of plaintiff Knopfler's Orthodox Jewish faith as head of a congregation.

115.    Moreover, even that strictly limited group of ten or less would be at risk of being declared "illegal" if a law enforcement officer decides that "there exists clear evidence to the contrary," such as the fact that Jewish worship requires a close gathering of four persons around the Torah, which could be deemed an "illegal" failure to maintain "social distancing."

---

[11]/ Cf. Exhibit B, Knopfler Dec., for verification of the facts in this section of the Amended Complaint.

**The Irrationality of
the Ban on "Gatherings"**

116.   Religious gatherings in churches or synagogues, which can easily accommodate "social distancing," are comparatively small and discrete and manifestly pose far less of a risk of viral transmission than the favored commercial gatherings, which involve:

 (a) innumerable close interpersonal exchanges of goods and services every day of the week;

(b) crowds and massive foot traffic in the favored businesses as well as seated customers in airports, train and bus stations;

(c) the touching of countless objects for sale and common surfaces, including keypads and touch screens, by potentially millions of people in the State of New Jersey;

(d) the close proximity of innumerable seated employees in the confined spaces of innumerable offices, backrooms and warehouses of essential businesses, and

(e) the totally unregulated physical presence of innumerable seated media employees in offices and studios, and gatherings of employees at the scenes of news coverage, in the course of mass media operations.

117.   Plaintiffs are both willing to observe the same limitations Order 107 and Order 122 impose on permitted non-retail businesses such as law firms or media operations, or the restrictions on being present in public, which amount to "social distancing" "whenever practicable" (but not with immediate family members *see* Order 107 ¶ 3) and sanitization of common surfaces.  (Order 107, ¶ 5; Order 122, ¶ 5)

118.   As pleaded above, plaintiff Robinson's congregation for his two Sunday Masses—a Low Mass and a High Mass—currently numbers around 50 congregants for each

Mass, which is the same number of persons that was permitted for "gatherings" under superseded Order 104.

119.    The same 50-person limit, with social distancing measures, is now permitted under Connecticut Governor Ned Lamont's Executive Order No. 7N, which specifically exempts religious gatherings from its limitation of other gatherings to no more than five people: "except that religious, spiritual or worship gatherings *shall not be subject to such increased restrictions,* and shall instead remain subject to the prohibition on gatherings of 50 or more people, provided that they employ reasonable and appropriate distancing measures."[12]/

120.    The priestly organization of which plaintiff is a member is operating its church in Connecticut under said protocol and plaintiff Robinson would do so in New Jersey, if there is to be any limit at all on the size of his congregation, which there should not be, as "social distancing" can be maintained when "practicable.

121.    As for plaintiff Knopfler, his congregation of 30-45 fits easily within that 50-person limit, if there is to be any limit at all, which there should not be, as "social distancing" can be maintained when "practicable.

### Defendant Murphy Indefinitely Extends
### His Ban on "Gatherings"

122.    On April 7, 2020, Executive Order 119 extended the declared "Public Health Emergency" indefinitely.

123.    On April 15, 2020, defendant Murphy admitted on national television, respecting his issuance of Order 107, that "I wasn't thinking of the Bill of Rights when we did this."[13]/

---

[12]/*See*,https://portal.ct.gov/-/media/Office-of-the-Governor/Executive-Orders/Lamont-Executive-Orders/Executive-Order-No-7N.pdf?la=en.

[13]/ *See*, https://www.foxnews.com/media/tucker-carlson-phil-murphy-bill-of-rights.

124.    On April 27, 2020, defendant Murphy announced the extension of Order 107, and thus AO 2020-4, indefinitely.[14]/

125.    There is no sign that defendant Murphy intends to relinquish his grip on the daily life of anyone present in the State of New Jersey, including the plaintiffs, by any date certain.

126.    Plaintiffs now seek declaratory, preliminary and final injunctive relief declaring Order 107 and AO 2020-4 unconstitutional, both facially and as applied to them, and restraining defendants accordingly.

<u>**COUNT I**</u>

**Violation of the First and Fourteenth Amendments to the U.S. Constitution**
**(Free Exercise of Religion)**
**42 U.S.C. § 1983**

127.    Plaintiffs re-allege and incorporate by reference the factual allegations in ¶¶ 1-125.

128.    Plaintiffs' sincerely held religious beliefs compel them to preside over religious gatherings in keeping with the teachings and requirements of their respective religions.

129.    The Free Exercise Clause of the First Amendment to the U.S. Constitution protects plaintiffs' religious activities.

130.    Defendant's interpretation and application of Order 107, as purportedly amended by AO 2020-4 (hereafter "the challenged Regulation"), substantially burdens both plaintiffs' free exercise of religion by forbidding them to preside over any religious gathering in their respective houses of worship or elsewhere in the State of New Jersey, save under arbitrarily oppressive conditions that strictly limit the size of their congregations to ten or fewer people, but only under

---

[14]/ *See*, "NJ stay-at-home order extended indefinitely as Murphy outlines path to reopening" @ https://www.pix11.com/news/coronavirus/gov-murphy-to-unveil-plan-to-responsibly-reopen-new-jersey

a mere presumptive "permission" that can be revoked whenever a law enforcement officer, in his unfettered discretion, decides that "there exists clear evidence to the contrary."

131.   The challenged Regulation is impermissibly underinclusive because it is riddled with exceptions while purporting to be facially neutral, fails to prohibit secular activity that endangers the purported state interest equally or to a greater degree than the prohibited religious conduct, and burdens religious conduct while not affecting substantial categories of conduct that are not religiously motivated.

132.   The challenged Regulation is therefore not a neutral law of general applicability and cannot be sustained unless it is narrowly tailored to serve a compelling state interest of the highest order.

133.   The challenged Regulation is not rationally related to a compelling state interest, nor is it the least restrictive means of accomplishing the purported compelling state interest of "reducing the rate of community spread of COVID-19."

134.   The undefined term "gatherings of individuals" has no rational relation to the goal of "social distancing," which can be accomplished even more readily in a church setting, where people can sit apart in the pews, than in a retail or office environment rife with direct interpersonal contacts and contact with common surfaces touched by innumerable other people: e.g., products for sale, shelves and counters, styluses for e-signatures, keypads, touch screens, public and office bathrooms, and innumerable other "fomites," such as doorknobs, handrails, etc.

135.   The challenged Regulation irrationally undermines the purported state interest by favoring numerous forms of business activity that pose a greater risk of viral transmission than the prohibited religious gatherings.

136.     Defendants have less restrictive means of achieving any legitimate interest served by the challenged Regulation, those being the same conditions on which they allow non-retail businesses, such as law and accounting firms, to operate: i.e., "social distancing" and sanitization.

137.     The challenged Regulation includes an unconstitutionally vague standard for its enforcement, AO 2020-4, that has never been promulgated to the general public by the Governor and does not adequately inform the public or even law enforcement officers as to which "presumptively" lawful gatherings of ten or fewer people are rendered unlawful because of "clear evidence to the contrary."

138.     As the pleaded facts demonstrate, the challenged Regulation irrationally, invidiously, and without any legitimate, much less compelling, state purpose discriminates against religious activities in favor of secular and commercial activities.

139.     Both facially and as applied to plaintiffs, the challenged Regulation violates the Free Exercise Clause of the First Amendment as made applicable to the States by the Fourteenth Amendment.

140.     In the absence of declaratory and injunctive relief, plaintiffs will be irreparably harmed.

141.     Plaintiffs have no adequate remedy at law for the violation of their constitutional rights.

## COUNT II

**Violation of the First and Fourteenth Amendments to the U.S. Constitution**
**(Violation of Freedom of Speech, Assembly and Expressive Association)**
**42 U.S.C. § 1983**

142.     Plaintiffs re-allege and incorporate by reference the allegations in ¶¶ 1-138.

143.    The First Amendment protects plaintiffs' right to peaceably assemble together with the members of their congregations.

144.    Plaintiffs' religious assemblies are intertwined with speech and expressive association, meaning the right to associate with others of like mind for a protected purpose.

145.    Because the undefined term "gatherings of individuals" employed in the challenged Regulation has no rational relationship to the goal of "limiting the spread" of COVID-19 by "social distancing," which can be practiced more easily, or no less easily, in a church or synagogue than in many retail and office environments, the challenged Regulation (Order 107 and AO-2020-4 taken together) operates solely to discriminate arbitrarily against groups of people based on their social, political or religious purposes rather than any alleged lack of "social distancing."

146.    Defendants have less restrictive means of regulating gatherings for the stated purpose of "reducing the rate of community spread of COVID-19."

147.    The challenged Regulation does not serve any compelling or even significant government interest, and is not narrowly tailored to achieve any legitimate state purpose.

148.    The challenged Regulation is also unconstitutionally vague as to the "clear evidence" that would overcome the purported presumptive permission for gatherings of ten or fewer people.

149.    The challenged Regulation thus impermissibly infringes on freedom of speech, assembly and expressive association without serving any compelling or even significant government interest.

150.    In the absence of declaratory and injunctive relief, plaintiffs will be irreparably harmed.

27

151.    Plaintiffs have no adequate remedy at law for the violation of their constitutional rights.

## COUNT III

**Violation of the Fourteenth Amendment**
**(Equal Protection – Substantive Due Process)**
**42 U.S.C. § 1983**

152.    Plaintiffs re-allege and incorporate by reference the allegations contained in ¶¶ 1-138.

153.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution guarantees equal protection of the laws, which requires that the State not treat the "suspect class" of religion differently from the class of similarly situated people or pass laws that burden First Amendment rights.

154.    The challenged Regulation treats the class or subclass of people who exercise freedom of religion by gathering with others for that purpose, including plaintiffs, differently from the similarly situated class of people who gather with others for secular purposes.

155.    Moreover, the class of those who gather for religious purposes in churches, chapels and synagogues is plainly less subject to the risk of infection or transmission than those engaged in commercial transactions involving crowded offices, large crowds every day of the week, physical exchanges, and common surfaces touched by potentially millions of people, which makes the suspect classification of the challenged Regulation even more irrational and invidious.

156.    The challenged Regulation cannot survive the strict scrutiny required of suspect classifications under the substantive due process component of the Equal Protection Clause as it

is far from neutral and generally applicable and is not narrowly tailored to serve a compelling state interest.

157.    The challenged Regulation, both facially and as applied, also violates plaintiffs' fundamental rights to freedom of speech, assembly and expressive association as alleged above.

158.    Even if the challenged Regulation did not involve a suspect classification or violate fundamental rights, its total ban on religious gatherings, except under the dubious and unconstitutionally vague "permission" of its component administrative order, AO 2020-4, while permitting numerous secular and commercial gatherings unrestricted as to size, is not even rationally related to a legitimate state interest and thus cannot survive even rational basis analysis under the Equal Protection Clause.

159.    Alternatively, the challenged Regulation cannot survive heightened scrutiny under the "hybrid-rights" theory the United States Supreme Court has recognized for purposes of Equal Protection analysis when, as here, multiple rights are violated by a purportedly neutral law.

160.    The challenged Regulation thus violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, including its substantive component.

161.     In the absence of declaratory and injunctive relief, plaintiffs will be irreparably harmed.

162.    Plaintiffs have no adequate remedy at law for the violation of their constitutional rights.

## COUNT IV

**Violation of the First and Fourteenth Amendment**
***Ultra Vires* State Action Under the DCA**
**42 U.S.C. § 1983**

163.    Plaintiffs re-allege and incorporate by reference the allegations contained in ¶¶ 1-138 and 153-157 above.

164.    The challenged Regulation is an *ultra vires* attempt to regulate every aspect of the daily lives of 9 million residents of the State of New Jersey: dictating for what reasons they may leave home; which businesses they may operate or patronize; which activities they may engage in and with whom they may engage in them; and banning every gathering of citizens the Governor deems "non-essential" and attempting to limit said gatherings to ten or fewer persons under a "presumed" permission that can be revoked whenever a law enforcement officer decides there is "clear evidence to the contrary."

165.    The DCA confers no such authority on the Governor.  Under New Jersey law, executive orders under the DCA must have a rational relationship to the legislative goal of protecting the public and must be closely tailored to the scope of the current emergency situation.

166.    The challenged Regulation is *ultra vires* the DCA and should be declared void and unenforceable, as it constitutes state action in violation of all the constitutional rights Order 107 infringes, as pleaded above.

167.    In the absence of declaratory and injunctive relief voiding and enjoining Defendant's *ultra vires* acts, plaintiffs will be irreparably harmed.

168.    Plaintiffs have no adequate remedy at law for the violation of their constitutional rights.

## **PRAYER FOR RELIEF**

**WHEREFORE**, plaintiffs respectfully pray that this Court grant the following relief:

A.    A temporary restraining order restraining defendants or their designates from enforcing the challenged Regulation of "gatherings of individuals"

30

(Order 107 and AO 2020-4 taken together) under any "social distancing" requirements different from those governing non-retail businesses such as law or accounting firms or media operations, or transportation hubs;

B.      In the alternative, compelling defendants to apply to all gatherings, including religious gatherings, the same 50-person limitation in prior Executive Order 104 with the "social distancing" protocol of Order 107;

C.      A preliminary and permanent Injunction so restraining defendants;

D.      A declaratory judgment that the challenged Regulation is wholly unconstitutional, both facially and as applied to plaintiffs;

E.      An  award of costs of this litigation, including reasonable attorneys' fees, pursuant to 42 U.S.C. § 1988; and

F.      Such other and further relief as this Court deems just and proper.

Dated: May 4, 2020

                              Respectfully submitted,


                              _____
                                    Christopher A. Ferrara CF-7123
                                    Special Counsel – Thomas More Society
                                    420 Route 46 East – Suite 7
                                    P.O. Box 10092
                                    Fairfield, NJ 07004-6092
                                    (973) 244-9895
                                    cferrara@thomasmoresociety.org
                                    *Counsel for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW JERSEY
(Newark Division)**

| | | |
|---|---|---|
| **REV. KEVIN ROBINSON** and | ) | |
| | ) | |
| **RABBI YISRAEL A. KNOPFLER,** | ) | |
| | ) | |
| Plaintiffs, | ) | **Case No.  2:20-CV-5420-CCC-ESK** |
| v. | ) | |
| | ) | |
| **PHIL MURPHY,** Governor of the | ) | |
| State of New Jersey, in his | ) | |
| official capacity, and | ) | <span style="color:red">**EXHIBIT A**</span> |
| | ) | |
| **COLONEL PATRICK J. CALLAHAN**, | ) | |
| Superintendent of State Police and State | ) | |
| Director of Emergency Management, | ) | |
| in his official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

**UNSWORN SUPPLEMENTAL DECLARTION
OF  PLAINTIFF REV. KEVIN ROBINSON
UNDER PENALTY OF PERJURY**

Pursuant to 28 U.S.C. § 1746, Plaintiff, Rev. Kevin Robinson, hereby declares under

penalty of perjury as follows:

1.      I am a plaintiff in this matter, and I make this Supplemental Declaration in

support of my counsel's motion for a preliminary injunction.

2.      By way of clarifying my prior declaration, I have a congregation of approximately

fifty people at *each* Mass on Sunday: the first, a 7:30 a.m. Low Mass and then a High Mass at 10

a.m.

3.      The Low Mass normally requires, in addition to the priest, two altar servers.

Thus, any limitation of religious gatherings to ten or fewer people—merely "presumed" to be

lawful unless a police officer decides there is "clear evidence" to the contrary—would mean that only 7 congregants could attend Mass, which is totally impractical as we cannot have 14 Low Masses a day to accommodate a total of 100 people.

4.      Even worse would be the situation at High Mass, which requires five altar servers: an MC, a Thurifer, a Cross-Bearer and two acolytes, which would leave a congregation of only 4 people, requiring 25 Masses a day to accommodate 100 congregants if every Mass were a High Mass.

5.      I understand that a later Executive Order, No. 122, imposes some new limitations on "essential retail businesses" such as operating at 50% capacity at any one time, which is still a very large number of people, and the wearing of masks by customers.

6.      It is not possible to celebrate Mass wearing a mask, but I am informed that there is no mask requirement for permitted non-retail businesses, such as law firms, under Order 107 or 122, but only "social distancing" of six feet when "practicable" and sanitization of common surfaces by building owners, which my priestly fraternity is already doing in Connecticut, as noted in my prior declaration.

7.      I would abide by such requirements in New Jersey or, as noted in my prior declaration, such requirements combined with the 50-person limit on gatherings under Executive Order 104.

8.      I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 4, 2020

_____

Rev. Kevin Robinson

2

## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF NEW JERSEY
### (Newark Division)

| | |
|---|---|
| **REV. KEVIN ROBINSON** and ) | |
| ) | |
| **RABBI YISRAEL A. KNOPFLER,** ) | |
| ) | |
| Plaintiffs, ) | **Case No.  2:20-CV-5420-CCC-ESK** |
| v. ) | |
| ) | |
| **PHIL MURPHY,** Governor of the ) | |
| State of New Jersey, in his ) | |
| official capacity, and ) | **EXHIBIT B** |
| ) | |
| **COLONEL PATRICK J. CALLAHAN,** ) | |
| Superintendent of State Police and State ) | |
| Director of Emergency Management, ) | |
| in his official capacities, ) | |
| ) | |
| Defendants. ) | |

## UNSWORN DECLARTION OF  PLAINTIFF RABBI YISRAEL A. KNOPFLER UNDER PENALTY OF PERJURY

Pursuant to 28 U.S.C. § 1746, Plaintiff, Rabbi Yisrael A. Knopfler, hereby declares under penalty of perjury as follows:

1.      I am co-plaintiff this case and I make this declaration in support of my attorney's motion for a preliminary injunction in this case.

2.      I am a rabbi of the Orthodox Jewish tradition and I preside over a synagogue located in Lakewood, NJ, Congregation *Premishlan*. I was ordained over 20 years ago in Israel.

3.      My congregation numbers 45-50 practitioners of Orthodox Judaism.

4.      I also preside over the rabbinical court *Beis Din Tzedek* of Lakewood. The Court has eleven members.

5.      My synagogue accommodates 30 people, and I minister to my congregation by holding two Davening services each Saturday, starting 35 minutes before sunrise and then again at 9:30 a.m.

6.      In addition, each day the synagogue hosts prayers during morning services, usually around 8:30 a.m., a noon service, and a night service around 11 p.m.

7.      The full panoply of synagogue prayers required by my religion must have a quorum of ten, and several of the congregants must gather closely around the Torah for a reading from the Torah a few times a week.

8.      Also, people come to my synagogue to pray and study the Torah and the Talmud together, especially young men.

9.      Governor Murphy's Executive Order 107 has drastically interfered in the practice of my Jewish faith in the following ways.

10.     On or about March 22, a Sunday, in fear of police action because of Order 107's ban on "gatherings of individuals," we began holding our morning prayer services in the backyard of the synagogue so that we could disperse if the police were called.

11.     Over the coming days, a number of the members of my congregation stopped attending services in fear of legal consequences from the Governor's order because it bans "all gatherings of individuals."

12.     In order to confirm this ban, I consulted the FAQs on the Governor's website, which stated clearly there must no religious gatherings for worship, funerals, weddings or the like.

13.     On or about April 3, at sundown on Friday, as the congregants were walking from different directions to the synagogue, two police cars parked directly outside the synagogue. The congregants were walking, not driving, because it was the Sabbath.

14.     The police cars had their red and blue overhead lights on to intimidate us and to make it appear as if some sort of police intervention were about to occur. They were clearly surveilling us to look for violations of Order 107.

15.     To avoid a confrontation with the police, we avoided having the prayer service in the backyard, escaped through the back gate and had the prayer service elsewhere.

16.     Because of this police interference, we changed the times of our Saturday morning prayer service, the main prayer service of the week, and our afternoon services as well, as it appeared that the police had learned the regular times for our services from their surveillances.

17.     On or about April 13, we were holding our morning services outside in the yard around 9:30 a.m. Approximately 20 congregants were present, and the distance between each of us was about ten feet.

18.     However, during the service, as required by our religion, four of us gathered around the Torah to read from it.

19.     Suddenly, two police officers, evidently responding to a neighbor's complaint, arrived and the congregants quickly began scattering in all directions. One of them ripped his pants while climbing over the fence to escape the police. Another hid in the boiler room under the steps and would not come out for 20 minutes.

20.     The two officers started walking around my yard while talking on their radios.

21.     I rolled up the Torah scroll, covered it, walked over to one of the officers and said: "You know, you're on private property," to which he responded: "Well, this is an illegal gathering."

22.     I replied: "This is my private property. You're trespassing. If you don't get off my property immediately, I will file a complaint against you."

23.     The officer then turned on his body cam and barked at the remaining congregants that they should not move because he was coming back with tickets, to which I responded that he would not be allowed back on my property without a warrant.

24.     The officers then retreated to the street, and I could see them attempting to count how many people had remained from the congregation.

25.     The remaining congregants, nine in number, went into a back room of the synagogue in fear of being arrested. They taped garbage bags on the windows and locked the door.

26.     They could not continue reading the Torah, which they had taken inside, because there was no quorum of ten.

27.     I knocked on the door, and only when they were satisfied that it was me did they let me in.

28.     We finished reading from the Torah and finished our prayers in that little room with 10 men, while the young children were sent into the main sanctuary to peek out from the now blacked out windows to let us know when the police left.

29.     Not only were the two police officers still there, but a female supervisor had arrived.

30.     The two male police officers were wearing masks, but the female supervisor was not.

31.     As we were completing the prayer service, one of my children came down to the synagogue from my house, upstairs. After identifying him, he was allowed into the back room. He came over to me and told me the police were banging on the front door of the house. I told him not to open the door.

32.     After completion of the service I went upstairs to my home on the second floor, where I am usually met by the raucous din of 13 kids eating breakfast. Surprisingly, the second floor was silent and deserted.

33.     I continued up to the third floor, where I met my almost 12-year-old daughter in a hysterical state.

34.     In response to my questioning look, she explained to me that after the police had knocked and upon receiving no response, retreated back to their cars, she continued playing with the younger kids in the foyer.

35.     She continued saying that after a few minutes, upon noticing the police woman approaching the house, she sent the little ones up to their bedrooms. As she followed, she suddenly heard the front door opening. She spun around and saw the unmasked police woman's head inside the house. She shrieked and bolted upstairs.

36.     A few minutes later the three officers left.

37.     After seeing that the officers had left, the remaining congregants furtively snuck out to their cars parked in the driveway of the synagogue, and, after checking the windshields for tickets, went home.

38.     Our fear was palpable. A 45-year old-congregant, who had been hiding in the boiler room, emerged from his hiding place quivering and quaking.

5

39.     Now we live in constant fear of another police intervention. Members of the congregation are constantly looking toward the street for police cars, and some hide inside the synagogue and come into the yard only for the most important parts of the services.

40.     We continue to hold the prayers in the yard in order to be able to escape the police if and when this happens again.

41.     Also, in fear of the consequences under Order 107, we have refrained from any gatherings of the *Beis Din Tzedek* of Lakewood rabbinical court, whose eleven members sit in tribunals of three in the synagogue or in the back room, along with the litigants and civil and rabbinical attorneys.  These gatherings have sometimes included up to twenty people.

42.     Our continued fear of police intervention is further justified because, also in the Town of Lakewood, the police broke up a prominent rabbi's funeral on April 2 and issued numerous summonses, as widely reported in the press. One of my congregants was present during this fiasco and fled the scene to observe the police violating Jewish rights from a distance.

43.     Furthermore, the Lakewood Police have broken up more than a dozen forbidden "gatherings" in Lakewood, some religious and some non-religious, as has also been widely reported in the press.

44.     For example, there is this report of the police breaking up a Jewish wedding: http://tomsriver.shorebeat.com/2020/04/police-break-up-four-gatherings-in-lakewood-including-an-open-school-and-backyard-wedding/

45.     I am asking the Court to afford my congregation the same degree of freedom that Order 107 affords to the non-retail business gatherings he favors, such as law firms, accounting firms and media operations, which is to say, best efforts to practice "social distancing" when "practicable" and sanitizing common surfaces by building owners.

6

46.     On this point, I note that it is absolutely impossible for Jewish worship to be conducted by video.  For one thing, there must be a physically present quorum of ten for every prayer service, and these ten cannot even be in different rooms in the same building let alone spread out on the Internet.  The suggestion is ridiculous.

47.     Further, given the supposed limitation of religious gatherings to ten or fewer people, the required quorum of ten men for all religious services would mean excluding the mother, sisters and other family members at a Bar Mitzvah and even the wife at a wedding in the synagogue, not to mention any relatives and friends who would wish to be present.

48.     Finally, while we had heard rumors of some sort of permission for gatherings of ten or less, we have since learned that this is not an Executive Order by the Governor but some kind of directive to police that they can "presume" gatherings of ten-or-less are lawful unless they decide there is "clear evidence" to the contrary.  We have no idea what this means and we are not willing to live under a regime in which a police officer decides whether our gatherings satisfy his presumption and we are limited to only ten people.

49.     I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 4, 2020

Rabbi Yisrael A. Knopfler

7




**NEW JERSEY**
**COVID-19 Information Hub**

**Call (General COVID-19 Questions)**: 2-1-1 (24/7)
**Call (Medical COVID-19 Questions)**: 1-800-962-1253 (24/7)
**Text NJCOVID to 898-211** to receive alerts

 Select a Language ⌄

**EXHIBIT C**

# Ask Your COVID-19 Questions Here

What would lead you to believe that someone is infected with C 

● **DATA DASHBOARD**     ✚ **FEELING UNWELL? CHECK YOUR SYMPTOMS**     👤 **JOBS PORTAL**      **HELP NJ**

**‹ Back to All FAQs**

# Are churches and other houses of worship still offering services?

**Copy Link to Article** 📋

In an effort to strengthen the existing social distancing measures in place, the Governor has issued Executive Order No. 107 which prohibits all gatherings of individuals, such as parties, celebrations, or other social events, unless otherwise authorized by the Order.

Residents should consult with their local houses of worship to see what alternatives are being offered in place of in-person services.

Posted/Updated: 3/27/20

Source: https://nj.gov/infobank/eo/056murphy/pdf/EO-107.pdf

 OFFICIAL SITE OF THE STATE OF NEW JERSEY  return to nj.gov


**NEW JERSEY**
**COVID-19 Information Hub**

**Call (General COVID-19 Questions):** 2-1-1 (24/7)
**Call (Medical COVID-19 Questions):** 1-800-962-1253 (24/7)
**Text NJCOVID to 898-211** to receive alerts

🌐 Select a Language ⌄

**EXHIBIT D**

# Ask Your COVID-19 Questions Here

What                                                    (ⓍⓎ)

● **DATA DASHBOARD**    ✚ **FEELING UNWELL? CHECK YOUR SYMPTOMS**    👤 **JOBS PORTAL**    NJ **HELP NJ**

**‹ Back to All FAQs**

# Are funerals and other memorial services allowed to be held right now?

**Copy Link to Article** 🗐

Funerals and other memorial services that involve in-person gatherings may not take place at this time.

In an effort to strengthen the existing social distancing measures in place, the Governor has issued Executive Order No. 107 which prohibits all gatherings of individuals, such as parties, celebrations, or other social events, unless otherwise authorized by the Order.

Posted/Updated: 3/23/20

Source: https://nj.gov/infobank/eo/056murphy/pdf/EO-107.pdf

 


Report a Correction | Legal Statement | Privacy Policy

Made with Love by the NJ Office of Innovation + Yext

 OFFICIAL SITE OF THE STATE OF NEW JERSEY 05420-CCC-ESK  Document 7   Filed 05/04/20   Page 43 of 48 PageID: 118

return to nj.gov



**Call (General COVID-19 Questions):** 2-1-1 (24/7)
**Call (Medical COVID-19 Questions):** 1-800-962-1253 (24/7)
**Text NJCOVID to 898-211** to receive alerts

🌐 Select a Language ∨

<span style="color:red">**EXHIBIT E**</span>

# Ask Your COVID-19 Questions Here

What would lead you to believe that someone is infected with COVID-19? 

● **DATA DASHBOARD**    ✚ **FEELING UNWELL? CHECK YOUR SYMPTOMS**    👤 **JOBS PORTAL**    NJ **HELP NJ**

**< Back to All FAQs**

## How can I report a violation of an Executive Order?

**Copy Link to Article** 📋

You can report a possible violation of any Executive Order using this online form: https://covid19.nj.gov/violation.

Some examples of Executive Order violations include:

- A non-essential business that is operating
- A non-essential construction project
- A business that is not practicing social distancing requirements
- A business that is not allowing remote work of non-essential employees
- A prohibited gathering of people

**Compliance with Executive Orders is not voluntary.**

Updated: 4/11/20
Source: Executive Orders

 


**NEW JERSEY**
**COVID-19 Information Hub**

**Call (General COVID-19 Questions):** 2-1-
**Call (Medical COVID-19 Questions):** 1-80
**Text NJCOVID to 898-211** to receive alerts

**EXHIBIT F**

## EXECUTIV
## VIOLATION
## FO

English (US)

If you are experiencing an emergency do not complete this form - please dial 911.

If you believe an employer, organization, or entity is violating any Executive Order, please complete this form.

**Compliance with Executive Orders is not voluntary.**

*Please note, we recommend using a modern web browser when completing this form. If you experience challenges, please try another web browser.*

**What is your name?** *

First Name          Last Name

**What is your email?** *

example@example.com

**What is your phone number?** *

Area Code     Phone Number

**What is the name of the business, organization, or entity that you believe is violating an Executive Order?** *

**What is the address of the business, organization, or entity that you believe is violating an Executive Order?** *

Street Address

Street Address Line 2

City                State / Province

Postal / Zip Code

**What county is the business, organization, or entity located in?**

**What is the phone number of the business, organization, or entity that you believe is violating an Executive Order?**

Area Code     Phone Number

**What type of violation do you believe is occuring?**

○ A non-essential business that is operating
○ A non-essential construction project
○ A business that is not practicing social distancing requirements
○ A business that is not allowing remote work of non-essential employees
○ A gathering of people
○ Other

**Please describe your complaint and the potential violation of an Executive Order. Please be as specific as possible. What exactly is the business or entity doing that is in violation of the Executive Order? This information will help us with follow up actions:** *

Note: there is a limit of 250 words in this field.          0 /250

Submit



**EXHIBIT G**

420 Route 46 East, Suite 7
PO Box 10092
Fairfield, New Jersey 07004

TELEPHONE   (973) 244-9895
FACSIMILE   (973) 244-9897

April 23, 2020

The Honorable Phil Murphy
Governor of New Jersey                          <u>By Federal Express</u>
State House
125 West State Street
Trenton, New Jersey, 08625-0068

Dear Governor Murphy:

I am Special Counsel to the Thomas More Society, a national public interest law firm that engages in civil rights advocacy and litigation on behalf of Catholics and other people of faith across the nation. I write to you on behalf of Father Kevin Robinson in respect to the "stay-at-home" Executive Order 107 (2020)("Order 107"), issued in response to the COVID-19 epidemic under an invocation of your "emergency powers" (Order 107 at 4). Order 107 supersedes Executive Order 104 (2020)("Order 104") but retains its "factual findings." (Order 107, ¶ 1)

Father Robinson is a Catholic priest who provides the Mass and Sacraments to sincere practitioners of the Catholic religion. His church with appurtenant facilities is located at 103 Gould Avenue, North Caldwell, New Jersey.   Father Robinson seeks clarification of Order 107 as applied under the still-operative "factual findings" of Order 104, in particular the following language: "Gatherings of individuals… are cancelled, unless otherwise authorized by any part of this Order" (Order 107, ¶ 5)—meaning, apparently, *all* social, political and religious gatherings.

The FAQ section of your COVID-19 information website provides the following answer to the question "Are churches and other houses of worship still offering services?":

> Executive Order No. 107… *prohibits all gatherings* of individuals, such as parties, celebrations, or other social events, unless otherwise authorized by the Order. Residents should consult with their local houses of worship *to see what alternatives are being offered in place of in-person services.* [1]

Given what appears to be the official interpretation of Order 107, all Catholic churches in New Jersey have been shuttered and Masses and other functions therein prohibited.  Father Robinson has complied with that reading of the Order by closing his church to the public.

Order 107, however, also authorizes an exception to its sweeping "stay-at-home" directive for "leaving home for an educational, religious or political reason."  (Order 107, ¶ 2[7]).  As attending Mass or some other religious function in a Catholic church involves leaving home for a

---

[1] <u>https://covid19.nj.gov/faqs/nj-information/general-public/are-churches-and-other-houses-of-worship-still-offering-services</u>

Hon. Phil Murphy
April 23, 2020
Page 2



**EXHIBIT G**

religious reason, there appears to be an internal conflict in the order. That is, how many people may leave home for the same religious purpose to be accomplished at the same place?

Further, the retained "factual finding" in Order 104, that "to mitigate community spread of COVID-19, it is necessary to limit the unnecessary movement of individuals in and around their communities," recites no scientific or other empirical basis for the finding. On the other hand, Order 104's abandoned allowance of 50-person or less gatherings—now replaced by Order 107's blanket "stay-at-home" directive, except for a few permitted purposes—was at least supported by a guideline issued by the Centers for Disease Control (Order 104, ¶ 2, sixth "whereas" clause).

While appearing to prohibit all *religious* gatherings, regardless of size, Order 107 allows *commercial* gatherings of any size on the premises of selected "essential businesses" with heavy foot traffic, including supermarkets, pharmacies, gas stations, convenience stores, hardware and home improvement stores, banks, laundromats, pet stores, and liquor stores.  (Order 107, ¶ 6)

Finally, Order 107 provides that violators of the Order, and those who aid or abet them, are subject to arrest and criminal prosecution for "disorderly conduct" under <u>N.J.S.A.</u> App. A: 9-49 and 50. In fact, Father Robinson was harassed by the local police the day before Order 107 went into effect, in very threatening terms, and was told by the police chief later on that charges will be laid if he opens the church.

Order 107 thus appears to involve radical infringements of freedom of speech, religion, expressive association, movement and assembly, as compared with superseded Order 104, which contained no "stay-at-home" directive and less drastically limited "gatherings" to 50 persons or less. (Order 104, ¶ 1) As you freely acknowledged during an appearance on Fox News on April 15: "So, *I wasn't thinking of the Bill of Rights when we did this*. We went to all — first of all — we went to the scientists who said people have to stay away from each other."[2]

Moreover, Order 107 irrationally and discriminatorily prohibits religious gatherings on the ground that they would further the spread of COVID-19 while permitting all manner of large commercial gatherings on the premises of "essential businesses" where the risk of spreading a contagion during the physical and interpersonal exchange of goods and services is obviously far greater, yet people are not required to "stay away from each other." At a church service, by contrast, people can easily sit six feet away from each other while avoiding physical contact.

There is no rational basis for banning all religious gatherings while allowing numerous commercial gatherings on the pretext of health and public safety. The United States Supreme Court long ago made it clear that while a state's emergency powers may permit temporary curtailment of constitutional rights during a genuine public health crisis, that curtailment must have some "real or substantial relation" to the crisis and may not involve measures that are "beyond all question, a plain, palpable invasion of rights secured by the fundamental law." <u>Jacobsen v. Massachusetts</u>, 1097 U.S. 11, 31 (1905).

---

[2] <u>https://www.foxnews.com/media/tucker-carlson-phil-murphy-bill-of-rights</u>

Hon. Phil Murphy
April 23, 2020
Page 3


**EXHIBIT G**

Furthermore, when government "prohibits religious activity while permitting non-religious activities, its choice 'must undergo the most rigorous of scrutiny.' That scrutiny requires [the state] to prove its interest is 'compelling' and its regulation is 'narrowly tailored to advance that interest.'" On Fire Christian Ctr., Inc. v. Fischer, No. 3:20-CV-264-JRW, 2020 WL 1820249, at *6 (W.D. Ky. Apr. 11, 2020)(striking down COVID-19 related ban on religious services).

We see no compelling government interest that dictates bans on all religious gatherings of any size while permitting many large gatherings in commercial premises, rife with commonly touched surfaces, including electronic keypads and items for sale. And even if it served a compelling government interest, Order 107 is far from narrowly tailored.

With these considerations in view, I hereby request confirmation from you, the Acting Chief Counsel, or the Attorney General (who are all receiving copies of this letter) of the following so that my clients may consider their legal options:

1. Is Father Robinson required by Order 107 to close the church premises at 103 Gould Avenue, North Caldwell, NJ?

2. Are Father Robinson and the members of his congregation forbidden to gather, in any number, for Mass or other public functions not only at said church premises but anywhere else in the State of New Jersey?

3. Are Father Robinson and those who might assist him subject to arrest and/or criminal prosecution if they gather for Mass or other public functions, in any number, at said church or elsewhere in the State of New Jersey?

If I have not received a satisfactory response to these questions within five (5) days from the date of this letter, or if the response is equivocal, my client will assume that you have required him to close the church premises and have prohibited him and his congregation from attending Mass or participating in any other gathering for a religious purpose, in any number, in violation of his civil and constitutional rights, and he will pursue legal remedies, including those available under 42 U.S.C. § 1983.

Sincerely,

Christopher A. Ferrara
Special Counsel

CAF:jao

xc: Honorable Gurbir S. Grewal, Attorney General
    Acting Chief Counsel Robert L. Garrenger III, Esq.
    Robert Drumm, Esq.
    Rev. Kevin Robinson



STATE OF NEW JERSEY DEPARTMENT OF LAW AND PUBLIC SAFETY DIVISION OF NEW JERSEY STATE POLICE OFFICE OF EMERGENCY MANAGEMENT

ADMINISTRATIVE ORDER

GATHERINGS

No. 2020-4

WHEREAS, on March 9, 2020, through Executive Order No. 103, the facts and circumstances of which are adopted by reference herein, the Governor declared both a Public Health Emergency and a State of Emergency throughout the State due to the public health hazard posed by Coronavirus disease 2019 (COVID-19); and

WHEREAS, to further protect the health, safety, and welfare of New Jersey residents by, among other things, reducing the rate of community spread of COVID-19, the Governor issued Executive Order No. 107 (2020) on March 21, 2020, the facts and circumstances of which are also adopted by reference herein, which established enhanced social mitigation strategies for combatting COVID-19; and

WHEREAS, Executive Order No. 107 cancelled gatherings of individuals, such as parties, celebrations, or other social events, unless otherwise authorized by Executive Order No. 107; and

WHEREAS, pursuant to paragraph 5 of Executive Order No. 107 (2020), the Governor granted the State Director of Emergency Management, who is the

Superintendent of State Police, the discretion to make clarifications and issue orders

related to the provisions regarding the gatherings of individuals;

NOW, THEREFORE, I, Patrick J. Callahan, State Director of Emergency Management, hereby ORDER as follows:

1.      Pursuant to paragraph 5 of Executive Order No. 107 (2020), it is hereby clarified that gatherings of 10 persons or fewer are presumed to be in compliance with the terms and intentions of the Executive Order, unless clear evidence exists to the contrary.

2.      This ORDER shall take effect concurrently with the effective date and time of Executive Order No. 107 (2020), which is Saturday, March 21, 2020 at 9:00 p.m., and shall remain in effect for as long as Executive Order No. 107 (2020) remains in effect or until I issue a subsequent amending Administrative Order.

March 21, 2020

Colonel Patrick J. Callahan

State Director of Emergency Management